IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 10-cv-00892-PAB-KLM

DONALD L. ETHERTON,

     Plaintiff,

v.

OWNERS INSURANCE COMPANY, a Michigan insurance company,

     Defendant.

---

## ORDER

---

     This matter is before the Court on Defendant's Motion for New Trial Pursuant to F.R.C.P. 59 and Renewed Motion for F.R.C.P. 50 Judgment as a Matter of Law [Docket No. 117] filed by defendant Owners Insurance Company ("Owners").

## I. BACKGROUND

     Plaintiff Donald L. Etherton brought this case against Owners, following a motor vehicle accident on December 19, 2007.  Docket No. 70 at 4, ¶ 1.  Plaintiff, who was injured in the accident, settled with the at-fault driver for $250,000.  *Id*. at ¶ 4.  Plaintiff then sought uninsured/underinsured motorist ("UIM") coverage from defendant, pursuant to an insurance policy with a $1,000,000 limit.  Docket No. 70 at 4, ¶ 3.  Defendant offered to settle the claim for $150,000.  Docket No. 70 at 2.  Plaintiff requested that defendant provide an explanation for the amount of the settlement offer and requested that defendant tender the $150,000 offer as the "undisputed" portion of his claim.  Defendant refused both requests and this litigation followed.  Docket No. 23

at 8.

Plaintiff filed this case in the District Court for the County of Boulder, Colorado,

on March 9, 2010, alleging, *inter alia*, breach of contract and unreasonable delay or

denial of an insurance claim in violation of Colo. Rev. Stat. §§ 10-3-1115, 1116.  Docket

No. 1-2 at 4-10, ¶¶ 27-80.  Defendant removed the case to this Court on April 21, 2010.

Docket No. 1.

On January 18, 2011, defendant filed a motion pursuant to Rule 702 of the

Federal Rules of Evidence to exclude from trial the opinions of certain of the proffered

experts.  Docket No. 24.  Defendant challenged the opinion of Joseph Ramos, M.D.,

that "Plaintiff's injuries, including lumbar disc protrusion, lumbar facet syndrome, lower

extremity paresthesia, lumbar radiulopathy, SI joint dysfunction, myofacial hypertonicity

and muscle spasm, insomnia, and myelopathy of the lower extremities, were entirely

caused by the subject collision," as well as several of Dr. Ramos' corollary opinions

dependent on that opinion.  Docket No. 24 at 1.  Defendant objected to these opinions

on the basis that "Dr. Ramos lacks the knowledge skill, expertise, training or education

to express this opinion.  In addition, the opinion is not the product of reliable principles

and methods and is based upon insufficient facts and data."  Docket No. 24 at 2.

On November 17, 2011, a hearing was held on defendant's challenge to Dr.

Ramos' opinions.  Docket No. 48.  At the conclusion of the hearing, Judge Marcia S.

Krieger[1] excluded Dr. Ramos' opinion on the basis that he did not consider "the

specifics of this collision and this injury" and did not "exclud[e] on a rigorous basis other

---

[1] On June 7, 2012, Judge Krieger recused herself from this case, which was subsequently re-drawn.  Docket Nos. 56 and 57.

alternative causes." *Id*. at 91-92.

On November 22, 2011, plaintiff filed a motion for reconsideration.  Docket Nos. 44 and 46.  Plaintiff argued that it was erroneous to exclude Dr. Ramos' opinions given the finding that his methodology is generally accepted in the medical community. Docket No. 46 at 4.  Plaintiff argued that the Rule 702 ruling "carved out a distinction, heretofore not supported by any binding precedent, between causation opinions that medical doctors form for the purposes of medical treatment versus causation opinions formed by medical doctors for the purpose of establishing legal liability." *Id*.  On September 13, 2012, the Court granted plaintiff's motion for reconsideration to the extent it sought admission of Dr. Ramos' opinions.  Docket No. 67 at 6.  The Court found that testimony at the Rule 702 hearing indicated that Dr. Ramos' methodology sufficiently takes into account alternative causes in determining specific causation. Docket No. 67 at 5.

On January 14, 2013, the Court began a six-day jury trial on plaintiff's claims for breach of contract and unreasonable delay or denial of benefits under Colo. Rev. Stat. § 10-3-1116.  Docket No. 100.  To prevail on his claims, plaintiff had the burden of establishing, by a preponderance of the evidence, that the collision caused his back injuries.  Docket No. 106-2 at 13.  At trial, Dr. Ramos testified about his methodology and offered his opinion that plaintiff's injuries were caused by the collision.  Docket No. 117-2 at 244-47.  Counsel for defendant cross-examined Dr. Ramos regarding each step of his methodology.  Docket No. 117-3 at 70-85.  Plaintiff did not introduce any other evidence in support of his theory of causation.  Docket No. 117 at 3; Docket No. 129 at 1-3.

3

At trial, defendant called Charles Edward Bain, M.D., to testify on causation issues. Dr. Bain testified that the first step of Dr. Ramos' methodology is unreliable from a biomechanical perspective because it does not take into account the magnitude and direction of force placed on an individual's spine in a particular collision. Docket No. 117-6 at 128-32. He further testified that the third step of Dr. Ramos' methodology is unreliable because it does not properly rule out an alternate cause that is "very prominent in the spine literature," namely, degeneration. Docket No. 48 at 61; *see also* Docket No. 117-6 at 139-40, 145-46.

On January 24, 2013, the jury rendered a verdict in favor of plaintiff on both of his claims. Docket No. 106-1 at 2. Defendant filed the instant motion on March 6, 2013, seeking a new trial on the basis that Dr. Ramos' opinions should have been excluded as unreliable under Rule 702. Docket No. 117.

## II. STANDARD OF REVIEW

Following a jury trial, a "court may, on motion, grant a new trial on all or some of the issues–and to any party" for "any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). The erroneous admission of expert testimony may be grounds for a new trial. *See Weisgram v. Marley Co.*, 528 U.S. 440, 445-46 (2000). A motion for judgment as a matter of law may be granted if "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). "[A] party need not renew an objection or offer of proof to preserve a claim of error for appeal" where "the court rules definitively

4

on the record–either before or at trial." Fed. R. Evid. 103(b).

A district court has "broad discretion" to decide "how to assess an expert's reliability, including what procedures to utilize in making that assessment, as well as in making the ultimate determination of reliability." *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1223 (10th Cir. 2003). The Tenth Circuit reviews de novo "the question of whether the district court applied the proper legal test in admitting an expert's testimony," but reviews the "actual application of the standard" for abuse of discretion. *Id.* A district court abuses its discretion if its decision is "arbitrary, capricious, whimsical or manifestly unreasonable" or "exceed[s] the bounds of permissible choice in the circumstances." *Id.*

The Federal Rules of Evidence permit the admission of scientific evidence if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. In *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592-93 (1993), the Supreme Court explained that district courts must assess scientific evidence to ensure it is both reliable–that is, based on a scientifically valid methodology–and relevant–that is, properly applied to the facts in the case. The Court offered a non-exclusive list of factors to consider, including whether the relied upon theory or technique (1) has been or can be tested; (2) has been subject to peer review and publication; (3) has a known or potential rate of error, and (4) is generally accepted within the relevant community. *Id.* at 592-95; *see also Goebel v. Denver & Rio Grande*

*Western R.R. Co.*, 215 F.3d 1083, 1087 (10th Cir. 2000) (explaining that the gatekeeper role set forth in *Daubert* "requires the judge to assess the reasoning and methodology underlying the expert's opinion, and determine whether it is scientifically valid and applicable to a particular set of facts"). "[W]hether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 153 (1999).

Reliability is not assessed in a vacuum. Rather, expert testimony is only admissible where it has a valid bearing on the facts of the case. *See Daubert*, 509 U.S. at 591 ("'Fit' is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes."). Although courts "should focus on the experts' methodology rather than the conclusions that they generate," in some cases a court "may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Hollander v. Sandoz Pharm. Corp.*, 289 F.3d 1193, 1205 (10th Cir. 2002) (internal citations omitted).

## III. ANALYSIS

Defendant argues that Dr. Ramos' causation opinion should have been excluded under Rule 702 because it lacks scientific validity, is not supported by credible medical literature, and is logically flawed. Docket No. 117 at 3. Plaintiff responds that Dr. Ramos' opinion is based on a methodology that the Tenth Circuit has found reliable in previous cases. Docket No. 129 at 7.

Establishing injury causation requires a showing of both general and specific

6

causation.  *Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 881 (10th Cir. 2005).  As

stated in *Neiberger v. Fed Ex Ground Package System, Inc.*, 566 F.3d 1184, 1190-91

(10th Cir. 2009), a reliable methodology for determining causation that is "generally

accepted in the medical community and by the courts" involves considering "the

possible recognized causes [of a condition] and eliminat[ing] those contradicted by the

evidence."[2]

"General causation" refers to whether the accident in question is, in the abstract,

capable of producing the type of injury suffered.  *Id*.  General causation may be

established by, for example, epidemiological evidence, *id.*, but an expert is not required

to cite published studies "in order to reliably conclude that a particular object caused a

particular illness."  *Hollander*, 289 F.3d at 1211 (citing *Turner v. Iowa Fire Equip. Co.*,

229 F.3d 1202, 1209 (8th Cir. 2000)).

"Specific causation" refers to whether a particular accident or substance caused

the specific injury at issue.  Once a party has established general causation, differential

diagnosis may be admissible to prove specific causation.  *Goebel*, 346 F.3d at 999.

"'Differential diagnosis' refers to the process by which a physician 'rules in' all

scientifically plausible causes of the plaintiff's injury.  The physician then 'rules out' the

least plausible causes of injury until the most likely cause remains."  *Hollander*, 289

F.3d at 1209 (internal citations and alterations omitted).  Differential diagnosis is

admissible even if the expert does not "explicitly rule out" every possible alternative

---

[2]Defendant argues that *Neiberger* is inapposite because, in that case, there was no dispute regarding general causation.  Docket No. 117 at 3-4.  However, regardless of this difference between *Neiberger* and the matter at hand, *Neiberger* is still relevant for establishing the reliability of the three-step methodology at issue.

cause.  *Goebel*, 346 F.3d at 999.  Although an expert may not rely solely on temporality to establish specific causation, temporality may be used as one factor "taken into account in considering causation."  *Watson v. Dillon Cos., Inc.*, 797 F. Supp. 2d 1138, 1155 (D. Colo. 2011).

At the November 17, 2011 Rule 702 hearing, Dr. Ramos described the methodology he used to assess injury causation in this case.[3]  He testified that his first step was to determine general causation, meaning whether or not the type of injury that plaintiff sustained could have been caused by the type of collision that plaintiff was in. Docket No. 48 at 14.  His second step was to consider whether there was a temporal relationship between plaintiff's injury and the collision.  *Id*.  His third step was to perform a differential diagnosis, in which he assessed specific causation by examining plaintiff's physical symptoms, medical records, reported medical history, and the applicable medical literature to identify and rule out alternative causes of plaintiff's injury.  *Id*.

Dr. Ramos' methodology tracks the step-by-step process that the Tenth Circuit has previously found to be a reliable means of determining injury causation.  *See Norris*, 397 F.3d 878.  The Court will thus proceed to consider defendant's specific

---

[3]Dr. Ramos cited a number of articles and textbooks in support of his methodology.  *See* Docket No. 48 at 24-27 (citing Randall L. Braddom, Physical Medicine & Rehabilitation 110 (4th ed. 2010); Michael D. Freeman, Christopher J. Centeno & Sean S. Kohles, *A Systematic Approach to Clinical Determinations of Causation in Symptomatic Spinal Disk Injury Following Motor Vehicle Crash Trauma*, 1 Physical Medicine & Rehabilitation 951 (October 2009); American Medical Association Guides to the Evaluation of Permanent Impairment 224 (6th ed. 2007); American Medical Association Guides to the Evaluation of Disease & Injury Causation (J. Mark Melhorn & William E. Ackerman eds., 1st ed. 2007); Samuel McLean, David Williams & Daniel Clauw, *Fibromyalgia After Motor Vehicle Collision: Evidence & Implications*, 6 Traffic Injury Prevention 97 (June 2005)).

objections to the application of this methodology to the facts of the case.

## A.  General Causation

Defendant argues that Dr. Ramos' method is unreliable because the first prong, determining general causation, assumes the conclusion it purports to prove.  Docket No. 117 at 12-13.  Plaintiff responds that Dr. Ramos permissibly relied on experimental data and medical literature to support his conclusion that plaintiff's injury could have been caused by the collision.  Docket No. 129 at 9, ¶ 19.

At the hearing, Dr. Ramos described his qualifications in part as follows:

I've also been an instructor at the Spine Research Institute in San Diego. That's particularly relevant to this case here, because it's largely a biomechanical course.  I was invited back to be an instructor and lecturer there, I believe, for three years.  This is one of the few places in the United States and probably was the last place that did live human crash test studies, where they actually put occupants into cars, put in black boxes that were donated by various automobile companies, put in seats donated by various automobile companies.  We did very high quality research on the kinematics to an occupant of a car at different speeds, at different vectors, at different angles.  I was a lecturer at that particular seminar for three years, about.

Docket No. 48 at 10; *see also* Docket No. 48 at 15 ("In the medical literature, at least in the peer-reviewed journals that we rely on, there have been testing from actual live crash-testing such as that I've been an instructor at courses in, as well as, you know, cadaver studies, where we've taken people who have died in crashes and actually taken sections of their spine and studied them for injury.").  He testified that "[t]here is a lot of literature that shows very specifically if you get rear-ended, you injure your back. Yes, very specifically: disc herniations, facet injuries,[4] absolutely."  *Id*. at 34.

---

[4]A "facet" is a "small smooth area on a bone or other firm structure."  Stedman's Medical Dictionary 144740 (27th ed. 2000).  Facets are located "on the transverse process of a vertebra for articulation with the tubercle of a rib."  *Id*.

Defense counsel asked Dr. Ramos whether his methodology required him to consider the speed at which vehicles in a particular collision were moving, the resulting force on an individual's spine, or the condition of an individual's spinal facets and lumbar discs at the time of the collision.  Docket No. 48 at 31-34.  Dr. Ramos testified that the "medical literature would suggest that the velocity is not a reliable predictor of injury, as neither is damage to a vehicle. . . . in fact, the medical literature . . . [says] as well that it's never been reliably proven that the delta V or the change in velocity is a reliable predictor of injury."  Docket No. 48 at 31-32.  Dr. Ramos testified that the amount of force on, and the strength of, an individual's spine prior to a collision are not relevant to a determination of general causation.  Docket No. 48 at 31-32.  The exchange between defense counsel and Dr. Ramos continued as follows:

> Q.  In your methodology, in considering whether this event was a plausible mechanism of causing injury, are you required to consider or determine the nature or strength of the anatomical structures that were purportedly injured and how much movement or force is necessary to injure or damage those structures?  And specifically I'm talking about the facets and the lumbar disc that was purportedly herniated as a result of this accident.  Does your methodology require that sort of analysis?

> A.  My methodology includes that analysis, because I'm telling you that the medical literature doesn't suggest that all these factors you're citing are reliable scientifically valid factors.

> Q.   So as I understand–I understand it then, your methodology for determining specific causation in this particular case is to say that generally it's been shown that a rear-end motor vehicle accident can cause a lumbar disc injury; therefore, you don't have to do any further investigation.  You've established the plausibility criterion simply because of that?

> A.  You're partially right and partially wrong.  It's not in general.  There is specific medical literature on point regarding low-back injuries in rear-end-impact motor vehicle crashes.  That's not general; that's very specific.

10

Docket No. 48 at 32-33.  At the end of cross-examination, defense counsel asked, "in your methodology, you would say that every single rear-end collision that has ever occurred is a plausible mechanism for causing a lumbar disc injury?"  Docket No. 48 at 37.  Dr. Ramos replied, "Yes."  *Id*.

Defendant argues that the "plausibility prong [in Dr. Ramos' analysis] is nothing but an unsupported and unsupportable assumption–the assumption that, regardless of the nature of an accident, regardless of the speeds, magnitudes, and forces, any car accident can cause any disc injury in any person."  Docket No. 117 at 14.  Defendant further argues that the Court erred in applying the *Daubert* standard because it did not review "the actual literature discussed by Dr. Ramos in support of his methodology."  Docket No. 117 at 12.  Plaintiff counters that Dr. Ramos properly relied on peer-reviewed medical literature and his knowledge of human anatomy to formulate his opinion on general causation.  Docket No. 129 at 13-17, ¶¶ 27-34.

Defendant relies in part on *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1336 (11th Cir. 2010), for the proposition that it is "necessary" for a district court to review the medical literature that an expert relies on and not merely "rubber stamp the opinions of expert witnesses once they are determined to be an expert."  *Kilpatrick*, however, is distinguishable.  In that case, the court began its analysis by noting that the expert "did not conduct any tests himself, and did not rely on any epidemiological studies of human beings."  *Id*.  Dr. Ramos, in contrast, testified that he has performed his own medical research on the relationship between low-impact rear-end collisions and lower back injuries.  Docket No. 48 at 10-11.  In light of this testimony, *Kilpatrick*'s admonitions do

11

not apply.[5]  *See Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 841 (9th Cir. 2001) ("a

very significant fact to be considered is whether the experts are proposing to testify

about matters growing naturally and directly out of research they have conducted

independent of the litigation"); *In re Zicam Cold Remedy Marketing, Sales Practices,

and Prods. Liability Litig.*, 2011 WL 798898, at *5 (D. Ariz. Feb. 24, 2011) ("the fact that

he is conducting the research suggests that his opinion can be tested").

Furthermore, Dr. Ramos' finding of general causation is not logically flawed.  His

methodology takes into account the velocity of the vehicles at the time of the collision

insofar as he relies on his research indicating that velocity is not a reliable indicator of

resulting lower-back injury.  *See* Docket No. 48 at 32-33.  Defendant did not present

evidence at the Rule 702 hearing (or the trial) that undercut the methodology or

conclusions of such research.  Dr. Ramos' causation opinion is not rendered unreliable

by his opinion on the relevance of velocity.

As the Court finds that the first step of Dr. Ramos' methodology was reliably

applied in this case, the Court proceeds to consider the second step.

---

[5]Other cases that defendant cites on this point are likewise distinguishable or
inapplicable.  For example, in *Claar v. Burlington Northern R.R. Co.*, 29 F.3d 499, 502
(9th Cir. 1994), the court excluded the opinions of experts who would not "explain the
reasoning and methods underlying their conclusions," which Dr. Ramos has done at
length, both at the evidentiary hearing and at trial.  The court in *Miller v. Pfizer, Inc.*, 356
F.3d 1326, 1335 (10th Cir. 2004), was concerned with whether the district court abused
its discretion by "considering [the expert's] credibility or weighing the evidence."  In
*Dodge v. Cotter*, 328 F.3d 1212, 1228 (10th Cir. 2003), the court was primarily
concerned with actions the district court took to limit the scope of the Rule 702 inquiry,
for example, by excluding live witness testimony from the *Daubert* hearing.  None of the
issues raised by these cases are present here.

### B.  Temporal Relationship

Defendant argues that the second prong of Dr. Ramos' methodology is flawed because it conflates correlation with causation.  Docket No. 117 at 18-22.

The Tenth Circuit has held that an expert may consider temporal connection as one factor in assessing causation so long as it is not the sole factor relied upon.  *See Goebel*, 346 F.3d at 999 ("The district court correctly relied on the temporal relationship between the tunnel incident and Mr. Goebel's symptoms as just one *factor* that supported Dr. Teitelbaum's conclusion.  The court is not permitted to, and did not rely on the temporal relationship by itself as evidence of causation.") (emphasis in original); *Clausen v. M/V NEW CARISSA*, 339 F.3d 1049, 1059 (9th Cir. 2003) (citing *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 154 (3d. Cir. 1999) ("A number of courts, including our own, have looked favorably on medical testimony that relies heavily on a temporal relationship between an illness and a causal event.")); *see also Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 265 (4th Cir. 1999) ("depending on the circumstances, a temporal relationship between exposure to a substance and the onset of a disease or a worsening of symptoms can provide compelling evidence of causation").

At the evidentiary hearing, Dr. Ramos listed the factors he considers at the second step of his methodology: "I would want physical exam findings that would coordinate; that would suggest a temporal relation of time; that physical exam coordinates.  I've mentioned diagnostic studies as well that are reviewed as part of the medical records.  I've mentioned all that as being considered in light of the medical literature."  Docket No. 48 at 44.  In addition, he testified that the "physical examinations

of Mr. Etherton by the other physicians in the immediate post-accident period are part of my medical record review, which are one of the factors in my methodology in addition to my own physical examination." *Id.* at 46.

Under applicable case law, Dr. Ramos' methodology is not rendered unreliable by the use of a temporal relationship as one factor–among several–bearing on the causation of Mr. Etherton's injury. *See Goebel*, 346 F.3d at 999.  Although defendant is correct that temporal proximity, standing alone, is not sufficient to establish causation, Dr. Ramos did not rely exclusively on this factor and instead permissibly considered it as part of a broader analysis, incorporating physical examination of plaintiff and review of plaintiff's medical records.  *See id*.

### C.  Specific Causation

Defendant argues that the third prong of Dr. Ramos' methodology is unreliable because Dr. Ramos did not use objective factors to rule out the possibility that plaintiff's injury was solely caused by degeneration.  Docket No. 117 at 22-29.  Plaintiff responds that Dr. Ramos' testimony "clearly establishes that Dr. Ramos considered whether a more likely cause of Plaintiff's injuries, such as degeneration, could be identified and eliminated the possibility of other causes by utilizing medical literature and Plaintiff's medical history."  Docket No. 129 at 21-22.

At his deposition, Dr. Ramos testified that "it's likely that Mr. Etherton had some degenerative changes in his low back associated with just age and time that were mild," Docket No. 129-2 at 6 (Ramos dep. at 46, ll.12-14), but that "a disk as is described in April of '08 that starts to lateralize to the right, that's more concerning that maybe there

was some compressive forces across his degenerative disk that forced it to the right

and that may be more crash related."  Docket No. 129-2 at 7 (Ramos dep. at 47, ll.12-

17).  At the Rule 702 hearing, Dr. Ramos testified as follows with respect to the third

step of his methodology:

> Insofar as I'm aware, with those factors I've outlined regarding my history
> with Mr. Etherton, my findings on physical examination, the diagnostic
> testing that I had available to me throughout the course of his care, the
> lack of predated records that would otherwise steer me that his condition
> had preexisted, that then applying the medical literature as we use here to
> determine causation, the temporal relationship, the factors I've already
> said–I don't want to beat the drum here too much.

Docket No. 48 at 17.  The hearing also contained the following exchange between

defense counsel and Dr. Ramos:

> Q.  Did you consider anything else as part of your methodology?
>
> A.  My methodology would include anything else that would be a more likely
> cause or a better alternative cause for the condition he was presenting for.
> And so that would include the intervening events, anything else essentially
> that would be a more likely cause.
>
> Q.  Does your methodology require you, for example, to consider whether
> degenerative processes related to genetics and aging were a causal factor
> for the herniated or protruding disc?
>
> A.  Yes.  In fact, the medical literature would suggest that he's at a higher
> risk for this due to those degenerative changes.

Docket No. 48 at 46.

"In the medical context, differential diagnosis is a common method of analysis,

and federal courts have regularly found it reliable under *Daubert*."  *Bitler v. A.O. Smith

Corp.*, 400 F.3d 1227, 1237 (10th Cir. 2004) (collecting cases).  "In order to be

admissible on the issue of causation, an expert's testimony need not eliminate all other

possible causes of the injury. . . .'  The fact that several possible causes might remain

15

"uneliminated" . . . only goes to the accuracy of the conclusion, not to the soundness of the methodology.'" *Jahn v. Equine Servs., PSC*, 233 F.3d 382, 390 (6th Cir. 2000) (quoting *Ambrosini v. Labarraque*, 101 F.3d 129, 140 (D.C. Cir. 1996)).

This case is distinguishable from the cases upon which defendant relies.  Unlike the challenged expert in *Kilpatrick*, Dr. Ramos did not testify that no one "in the medical community 'understands the physiological process by which'" lumbar disc injury develops "'and what factors cause the process to occur.'"  *See* 613 F.3d at 1343. Unlike the challenged experts in *Huerta v. BioScrip Pharmacy Servs., Inc.*, 429 F. App'x 768, 774, 776 (10th Cir. 2011), Dr. Ramos did not rely on information that later proved incorrect or base his conclusion solely on his personal knowledge of the plaintiff. *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1243-44 (11th Cir. 2005), is likewise inapposite because Dr. Ramos' testimony establishes that he did consider the background risk of lumbar injury posed by degeneration.

Dr. Ramos' testimony indicates that he concluded, based on the medical literature, plaintiff's medical records, and his physical examinations of plaintiff, that degeneration rendered plaintiff more susceptible to subsequent injury, but did not cause the observed disc herniation and resulting symptoms of pain.  *See* Docket No. 129-2 at 7 (Ramos dep. at 47, ll.12-17); Docket No. 48 at 18, 46.  This is sufficient to establish that his methodology was reliably applied with respect to specific causation.  *See Goebel*, 346 F.3d 987, 999 (10th Cir. 2003) (specific causation opinion admissible where expert "followed a standard and accept methodology in arriving at the diagnosis, [] adequately explained why [plaintiff] might not exhibit every symptom of [diagnosed

16

condition], and [] adequately considered and ruled out some alternative explanations even if he did not explicitly rule out depression."); *see also Bitler*, 400 F.3d at 1238 ("We see no abuse of discretion . . . in the district court's admitting testimony that employs an expert's physical investigation, professional experience, and technical knowledge to establish causation in this case.").

### D.  Fit Between Methodology and Litigation Context

Defendant argues that, while Dr. Ramos' methodology is accepted in the medical community for the purpose of diagnosis and treatment, it is not reliable in the context of litigating the cause of plaintiff's injuries because "treatment providers have no practical reason to evaluate injury causation, and instead rely primarily on the subjective report of the patient."  Docket No. 117 at 30.  Plaintiff counters that the "injury causation methodology used by Dr. Ramos is generally accepted in the medical community, by the courts, and is based on a valid scientific method."  Docket No. 129 at 23, ¶ 51.

In *Daubert*, the Court explained that "scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes" and held that Rule 702 "requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility."  509 U.S. at 591-92.

Defendant does not cite, and the Court has not found, any precedent supporting the conclusion that the opinion of a physician regarding causation, when based on a methodology accepted as reliable within the relevant medical field, must be excluded because it lacks a valid scientific connection to the question of causation in a civil trial. *See generally* Docket No. 117.  On the contrary, it appears that the opinions of treating

17

physicians on injury causation–based on medical knowledge, physical examination, and patient histories–are routinely admitted in federal courts. *See, e.g.*, *Matlin v. Langkow*, 65 F. App'x 373, 384 (3d Cir. 2003) (upholding admission of physician's testimony on causation where physician "examined [plaintiff], and, given [plaintiff's] statement to him about the automobile accident, reached the conclusion that the injury he diagnosed had been caused by the automobile accident"); *Laski v. Bellwood*, 1997 WL 764416, at *3 (6th Cir. Nov. 26, 1997) ("the district court should have allowed the testimony of the plaintiff's [treating physicians] and erred in failing to do so on the basis of those witnesses' lack of expertise in the specialized fields of biomechanics and accident reconstruction"); *Rivera v. United States*, 2012 WL 3132667 (S.D.N.Y. July 31, 2012) (admitting opinion of treating physician on causation of neck injury following automobile collision); *Santoro v. Signature Construction, Inc.*, 2002 WL 31059292, at *4 (S.D.N.Y. Sept. 16, 2002) ("even after *Daubert*, treating physicians have routinely been permitted to testify to determinations that they made in the course of providing treatment regarding the cause of an injury and its severity").

Defendant's reliance on *Alexander v. Smith & Nephew, P.L.C.*, 98 F. Supp. 2d 1310 (N.D. Okla. 2000), is misplaced. In *Alexander*, the court held that a workers' compensation physician was not qualified to testify regarding defects in a spinal fixation device and the cause of plaintiff's spine injuries. *Id*. at 1315. The court held that these topics fell outside of the physician's expertise because he lacked "experience or training in orthopedics, spinal surgery, spinal fusion with instrumentation, neurology, or other areas related to the specialized opinions he has offered in this case." *Id*. The court

18

further held that a "blanket qualification for all physicians to testify as to anything medically-related would contravene the Court's gate-keeping responsibilities." *Id.*

The circumstances of *Alexander* are different from the case at hand.  Dr. Ramos is a practicing physician who focuses on treating musculoskeletal injuries, *see* Docket No. 117-2 at 217, and who has performed his own empirical research on the relationship between rear-end collisions and spine injuries.  *Id.* at 215-16.  He did not reach outside his area of expertise to opine on the functioning of a medical device or procedure with which he has no familiarity.  *See Alexander*, 98 F. Supp. 2d at 1315. There is no dispute that the methodology he used in arriving at that opinion is one that is used widely in the medical profession to determine causation.  *See* Docket No. 48 at 92 ("There is no doubt that [Dr. Ramos' methodology] has general acceptance in the medical community."); Docket No. 67 at 5; Docket No. 117 at 29-30.  Furthermore, Dr. Ramos had a reasoned basis for his conclusion that velocity is not a reliable predictor of injury.  *See* Docket No. 48 at 32-33.

Given Dr. Ramos' research and clinical experience in the field of orthopedics, and his use of a methodology generally accepted in the medical profession, the Court concludes that Dr. Ramos' testimony had a "valid scientific connection to the pertinent inquiry."  *See Daubert*, 509 U.S. at 591-92.  Defendant's argument regarding "fit" goes to the weight, rather than the admissibility, of his testimony.  *See Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 970 (10th Cir. 2001) ("as long as an expert stays within the reasonable confines of his subject area, our case law establishes a lack of specialization does not affect the admissibility of the expert opinion but only its

weight") (internal citation omitted).

The Court's role as a gate-keeper does not extend to determining whether an expert is correct. *See Bitler*, 400 F.3d at 1233 ("a trial court's focus generally should not be upon the precise conclusions reached by the expert, but on the methodology employed in reaching those conclusions"); *Mitchell v. Gencorp Inc.*, 165 F.3d 778, 781 (10th Cir. 1999) (a plaintiff "need not prove that the expert is undisputably correct or that the expert's theory is 'generally accepted' in the scientific community" in order to establish the admissibility of the expert's opinion under Rule 702); *Squires ex rel. Squires v. Goodwin*, 829 F. Supp. 2d 1041, 1055 (D. Colo. 2011) ("the court's 'gatekeeping' responsibilities under Rule 702 do not turn on the 'correctness' of an expert's opinions"). So long as the Rule 702 standards are met, an expert may testify at trial, where he or she will be subject to cross-examination and where the other party may offer the rebuttal testimony of its own experts, as was done here. *See* Charles Alan Wright et al., 29 Fed. Prac. & Proc. Evid. § 6262 (1st ed. 2013) ("[W]here expert testimony has the scientific earmarks of reliability, the judicial inquiry is over. The courts are not to decide if the expert's opinions are, in fact, scientifically or technically correct. The evidence is then admitted and subjected to the kind of adversarial attack that facilitates the jury's central functions of deciding what weight to attribute to evidence and what witnesses to believe.").

## IV. CONCLUSION

As defendant has not shown that the Court erred in admitting Dr. Ramos' expert testimony, there is no basis for granting defendant's request for a new trial or judgment

as a matter of law.  Wherefore, it is

**ORDERED** that Defendant's Motion for New Trial Pursuant to F.R.C.P. 59 and

Renewed Motion for F.R.C.P. 50 Judgment as a Matter of Law [Docket No. 117] filed by

defendant Owners Insurance Company is DENIED.

DATED March 31, 2014.

BY THE COURT:

 s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge